## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## HARRISON DIVISION

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**                                                **PLAINTIFF**

**V.**                                         **CASE NO. 3:23-CV-3040**

**INTERVENTIONAL PAIN MANAGEMENT**
**ASSOCIATES, PLLC and BAXTER COUNTY**
**REGIONAL HOSPITAL, INC. d/b/a BAXTER**
**COUNTY REGIONAL MEDICAL CENTER**                                **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Now before the Court are a Joint Motion for Summary Judgment (Doc. 35), brief in support (Doc. 36), and statement of facts (Doc. 37) filed by Defendants Interventional Pain Management Associates, PLLC ("IPMA") and Baxter County Regional Hospital, Inc. d/b/a Baxter County Regional Medical Center ("Baxter"). Plaintiff Equal Employment Opportunity Commission ("EEOC") filed a Response in Opposition (Doc. 40) and statement of facts (Doc. 41), and Defendants each filed a Reply (Docs. 45 & 46). For the reasons stated herein, Defendants' Joint Motion for Summary Judgment is **DENIED**.

The EEOC brings this Title VII retaliation action on behalf of Hillary-Paige Graves Potter, a former physician assistant ("PA") with IPMA. Plaintiff asserts that Defendants terminated her employment in retaliation for Potter's role in reporting harassment allegedly perpetuated by one of IPMA's physicians against a Baxter medical technician. At all times, IPMA employed fewer than fifteen employees. Of course, this means that—standing alone—IPMA cannot be held liable for retaliation as an employer under Title VII. *See* 42 USC § 2000e–2(a) (imposing liability only on an "employer"); *id*. at § 2000e(b) (defining "employer" as having "fifteen or more employees" during a certain period).

1

"However, in certain circumstances, employees of separate entities may be combined for purposes of meeting the employee numerosity requirement." *Davis v. Ricketts*, 765 F.3d 823, 827 (8th Cir. 2014). Plaintiff argues that such consolidation is appropriate in this case because IPMA and Baxter operate as a single employer.[1] The Court bifurcated discovery so that it could first take up this threshold matter. *See* Doc. 28. Consequently, this Order addresses only whether Defendants should be consolidated as a single employer under Title VII; it does not address the merits of Plaintiff's retaliation claim.

## I.  BACKGROUND

Baxter is a non-profit hospital in Mountain Home, Arkansas. (Doc. 41, ¶ 1).[2] IPMA is a for-profit professional limited liability company. *Id.* at ¶ 23. More specifically, IPMA is a practice group of physicians and mid-level providers (e.g., advanced registered nurses

---

[1] The parties use the terms "joint employer" and "single integrated enterprise" in their papers. To determine whether two entities are an integrated enterprise (also referred to as a "single employer"), courts apply a four-factor test set forth in *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 392 (8th Cir. 1977). However, the parties—and district courts within this circuit—appear to dispute what test applies to the "joint employer" analysis. *See Gilliland v. Cont. Land Staff, LLC*, 2019 WL 5068651, at *10–12 (D.N.D. Oct. 9, 2019) (reviewing the disparate views amongst district courts in the Eighth Circuit).

Despite Plaintiff nominally asserting both a joint employer and integrated enterprise theory, Plaintiff advances its argument for consolidation under the *Baker* test only. *See* (Doc. 40, p. 1 ("Because genuine issues of material fact exist on the four-part test outlined in [Baker] as to whether Defendants are an integrated enterprise or a joint employer, the Court should deny summary judgment at this stage of the litigation.")); *id.* at p. 13 ("The same four[-]factors test applies to both[ ] the integrated enterprise and joint employer analysis."). Therefore, regardless of label, the Court construes the four-factor *Baker* test to be the only theory on which Plaintiff rests its argument. The Court, then, will address only whether Defendants may be liable as Title VII employers under the four-factor test and will use the term "single employer."

[2] In citing to specific paragraphs of Doc. 41, the Court includes both Defendants' initial statement of fact and Plaintiff's response to each paragraph. The Court also notes that Plaintiff disputes many facts in Doc. 41 without citing contradictory evidence. The Court does not credit such nominal disputes as creating a genuine issue of fact.

and physician assistants) (collectively, "IPMA providers") that provides interventional pain management services in Baxter's pain clinic. *See id.* at ¶¶ 44, 81. Dr. Ronald Tilley and Dr. Ira Chatman founded and incorporated IPMA in 2013. *Id.* at ¶ 27. The primary pain management clinic was in Mountain Home, but Baxter also had a satellite location in Harrison. IPMA supplied the medical providers for both locations. At no time between 2018 and 2024 did IPMA have fifteen or more providers, let alone *employed* providers. *Id.* at ¶¶ 35–41, 45–51; *see also* Doc. 35-15, ¶¶ 5, 8–10.

Potter was a physician assistant (i.e., a mid-level provider) employed by IPMA from late 2017 or early 2018 until her termination in early-to-mid 2022. *See* Doc. 41, ¶¶ 150, 218. In 2019, a Baxter medical technician who worked in Baxter's pain clinic made a complaint against Dr. Tilley for sexual harassment. *Id.* at ¶ 190; Doc. 35-14, p. 12. An investigation was initiated, and the complaint made its way up to Baxter's General Counsel and Medical Executive Committee. (Doc. 41, ¶ 197). Prior to any decision from the Medical Executive Committee, Dr. Tilley resigned his privileges at Baxter and his position at IPMA. *Id.* at ¶ 201. Until his departure in 2019, Dr. Tilley was IPMA's managing member. *Id.* at ¶ 54. Then, Dr. Chatman became managing member. *Id.* at ¶ 55.

There are three contractual agreements that form the basis of the relationships in this case: (1) the Services Agreements between IPMA and Baxter; (2) the Loan Agreement between Potter and Baxter; and (3) the Employment Agreement between Potter and IPMA. There is also a more-or-less peripheral Protocol Agreement between Potter and Drs. Tilley and Chatman.

In determining whether two entities are a single employer, a court should consider: (a) the degree of interrelation between the operations; (b) the degree to which the entities

share common management; (c) the centralized control of labor relations; and (d) the degree of common ownership or financial control over the entities. *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 392 (8th Cir. 1977); *Davis*, 765 F.3d at 827. To streamline its analysis, the Court has organized the facts according to these considerations.

### A. Interrelation of Operations

Around 2013, Dr. Ronald Tilley approached Baxter about opening an interventional pain management[3] practice to serve residents in the Mountain Home area. (Doc. 41, ¶¶ 77, 81). At that time, Baxter was providing only very limited interventional pain management services to its patients and was considering closing its pain management practice. *Id.* at ¶¶ 78–79. Baxter and IPMA entered into a series of Professional Services Agreements ("Services Agreements"), including ones signed in 2016 and 2020. *Id.* at ¶ 83. The arrangement was structured such that Baxter maintained a "Department," or clinic, of interventional pain management—i.e., an outpatient facility that provided pain management services—for which IPMA would supply the medical providers. Baxter would then supply the necessary facilities, equipment, and support personnel to run the Department.

Plaintiff notes that Baxter and IPMA did not always distinguish themselves as separate entities in the image they presented to the public. For example, IPMA used Baxter letterhead for its correspondence. *See id.* at ¶ 74. Additionally, IPMA's online presence was almost entirely through Baxter's website, including the clinic's hours,

---

[3] Interventional pain management refers to a subspecialty of medicine, similar to how one might refer to specialties like radiology, orthopedics, or obstetrics and gynecology. As much of the evidence explains, though, "Interventional Pain Management" is the name for the field of medicine—it is not inherently tied to IPMA though the names are very similar. (Doc 41, ¶ 25).

address, and contact information, and the provider's biographical information. *Id.* at ¶ 74; Doc. 40-1; *see* Doc. 40-14, ¶ 25 (Potter declaring that Baxter required her to draft a short biography for its website).

According to Baxter-employed pain clinic director Diane Holmes, the relationship between IPMA and Baxter "was a very unique situation," and "it was confusing to people that worked at the hospital because it was so unusual." (Doc. 40-17, p. 32). She went on to explain that some people would call it a pain clinic, others a pain department, and that "everyday employees" just "didn't understand the uniqueness of the situation." *Id.*

### 1. Personnel

Under the Services Agreements, IPMA supplied medical providers, including physicians and mid-level providers, to Baxter's interventional pain management clinic. Baxter did not employ or contract with any other interventional pain management medical providers during the time in question. *See* Doc. 35-1, p. 15; *see also* Doc. 35-2, p. 3. Baxter did, however, provide support staff to the Department, including management, nurses, medical technicians, lab employees, and clerical workers (e.g., receptionists/schedulers, coders, intake staff, and insurance specialists) (collectively, "Baxter support staff"). (Doc. 41, ¶ 96; Doc. 35-12, p. 4; Doc. 35-13, p. 9). This included the clinic director, which the Court understands to be an administrative role in charge of the operational side of the clinic and distinct from the role of medical director. (Doc. 41, ¶ 100; Doc. 35-12, pp. 2–3). The clinic director supervised the forty-or-so support staff. (Doc. 35-13, p. 8).

Since 2018, IPMA has characterized its relationships with its physicians as either members/owners or independent contractors. (Doc. 41, ¶ 32). IPMA also entered

Employment Agreements with several mid-level providers, including physician assistants like Potter, which set out the terms of their employment. IPMA providers were required to obtain and maintain privileges with Baxter. *See* Doc. 35-1, pp. 10, 24; Doc. 40-16, p. 6 (Tilley stating, "if a provider is unable to obtain clinical privileges, then they cannot work"). Otherwise, as Dr. Chatman put it, they would fall outside IPMA's contractual agreement with Baxter. (Doc. 40-18, pp. 30–31). Providers were required to comply with Baxter's Bylaws—including certain qualification requirements—to maintain their privileges. *See* Doc. 40-12, pp. 2–3.

### 2. Facilities and Equipment

In addition to support personnel, Baxter agreed to provide the building, the "necessary and appropriate" equipment, diagnostic and medical instruments, supplies, and medicines. (Doc. 41, ¶ 96; Doc. 35-1, pp. 13, 28). Baxter had "final authority as to the meaning of 'necessary and appropriate'" and provided that IPMA may supplement these provisions with Baxter's consent. (Doc. 35-1, pp. 13, 28).

The building in which IPMA operates the pain management clinic in Mountain Home is owned by BRMC Pain, LLC—an entity that is jointly owned by Dr. Chatman and Dr. Tilley (49%) and Baxter (50%). (Doc. 41, ¶¶ 84–85). Baxter then leases the building from BRMC Pain, LLC and provides it to IPMA. Doc. 41, ¶ 86; *see* Doc. 35-1, p. 28. An executive at Baxter, Barney Larry, negotiated the purchase of the clinic's building. (Doc. 41, ¶ 84; Doc. 35-16, p. 4). Baxter also paid for the computers, office supplies, and utility bills, (Doc. 35-12, p. 26), as well as the monthly fees for IPMA's record-keeping software, (Doc. 35-11, p. 20).

### 3.  Licensure, Credentials, and Insurance

The Loan Agreement between Potter and Baxter specified—explained in more detail, *infra*—that her "first day of practice shall not begin until [she] has obtained an unrestricted license to practice medicine in the State of Arkansas at least sixty (60) days prior to the first day of practice." (Doc. 35-4, p. 14). As Potter's supervising physician, Dr. Tilley assisted Potter in obtaining her Arkansas license and credentials, which included appearing before the Arkansas State Medical Board and signing a Protocol Agreement. (Doc. 41, ¶¶ 172, 174). Baxter did not assist Potter with her application for licensure to the Arkansas State Medical Board. *Id.* at ¶ 170.

Potter also went through an insurance credentialing process prior to her first day of work. *Id.* at ¶ 177. The parties dispute whether Baxter employees assisted Potter in obtaining these credentials or whether she was assisted by a separate non-profit organization, Baxter Regional PHO, Ltd., owned by Baxter and a group of physicians. *Id.* at ¶¶ 178–79. As for IPMA, clinic director Holmes would assist IPMA in uploading its licensure to Medicaid and other databases as needed, including updating the licensing for the Council for Affordable Quality Healthcare every 90–120 days. (Doc. 40-17, p. 24).

The Services Agreements between IPMA and Baxter required IPMA to obtain and maintain professional liability insurance that included a clause stating that coverage could not be cancelled without providing thirty-days' written notice to Baxter. (Doc. 35-1, pp. 14, 28). Further, if cancellation by the insurer was due to IPMA's failure to pay premiums, Baxter must be given an opportunity to pay the premium and maintain the insurance; in such cases, Baxter would provide notice to IPMA for reimbursement and withhold any payments to IPMA until reimbursement was received in full. *Id.* IPMA always maintained

its own separate malpractice insurance, business insurance, and separately identifiable Medicare and Medicaid provider numbers. (Doc. 41, ¶ 29). Potter's Loan Agreement with Baxter, Baxter's Medical Staff Bylaws, and Potter's Employment Agreement with IPMA all required that she have professional liability insurance. (Doc. 35-4, p. 14; Doc. 35-5, p. 68). IPMA provided Potter's insurance by paying her premiums and/or including her as an insured on IPMA's professional malpractice insurance and under the umbrella of Dr. Tilley's personal medical malpractice insurance. Doc 41, ¶ 157; Doc. 35-5, p. 68; Doc. 35-8, ¶ 10; *see also* Doc. 35-10, pp. 141–43.

### 4. Recordkeeping and Billing

Baxter established all fees for services rendered in the pain management clinic. (Doc. 35-1, pp. 13, 27 (Services Agreements)). At the Mountain Home clinic, IPMA would bill patients and insurance companies a fee for its professional medical services, and Baxter would separately bill a facilities fee for use of the clinic. (Doc. 41, ¶ 73). IPMA and Baxter used different billing companies for services provided in Mountain Home. *Id.* at ¶ 72. At the Harrison location, patients received a combined bill from Baxter, which Baxter then collected and paid out to IPMA. *Id.* at ¶¶ 75, 76. These billing arrangements were laid out in the Services Agreements. (Doc. 35-1, pp. 13, 27).

Baxter support staff assisted in coding visits for insurance and billing for IPMA, and clinic director Holmes testified that she would personally hand deliver these tickets to IPMA's billing company. (Doc. 40-17, p. 37). There is evidence that the two entities used the same recordkeeping software for coding, billing, and diagnostic records, which required a Baxter-provided email and password. (Doc. 41, ¶ 72; Doc. 40-14, ¶ 32; 40-17, pp. 33–34). And, per the terms of the Services Agreements, IPMA's accounts and records

of its professional work and patient histories were "the exclusive property" of Baxter. (Doc. 35-1, pp. 13, 27).

## B.  Common Management

A fair summary of the undisputed facts is that IPMA's medical director—namely Dr. Tilley or Dr. Chatman—and IPMA providers oversaw the provision of medical care in the clinic, subject to Baxter's privileges' requirements. And the Baxter-employed clinic director—namely Diane Holmes or Tasha Dees—oversaw the administrative running of the clinic. The Services Agreements also consolidated management of certain aspects of the day-to-day running of the entities. For example, it set forth specific clinic hours, and it required IPMA to respond to patient complaints by documenting any investigation and resolution and submitting a written plan of action to Baxter's administration. (Doc. 35-1, pp. 11, 24). The degree to which the two entities shared management over the facilities and supervision over provider and staff is further detailed in the following section.

## C.  Centralized Control of Labor Relations

### 1.  Human Resources

Baxter has an internal human resources department that handles personnel matters for Baxter employees. (Doc. 41, ¶ 9). Baxter also has a two-day orientation for new employees. *Id.* at ¶¶ 10–11. IPMA providers, including Potter, did not receive this training—or any other training or onboarding—from Baxter HR. *Id.* at ¶¶ 107, 108, 110, 183. IPMA providers must follow Baxter's Bylaws and nondiscrimination policy, but Baxter HR does not otherwise develop or provide HR-related personnel policies for IPMA physicians or employees. *Id.* at ¶ 106; *see also* Doc. 40-15, p. 33. And while Baxter's Employee Handbook states that its harassment policy applies to all employees,

supervisors, agents, and non-employees of Baxter, there is no evidence that Baxter provided the Handbook to or reviewed it with any of the IPMA providers. (Doc. 41, ¶ 109; Doc. 40-11, p. 13).

Baxter and IPMA separately handled payroll, tax services,[4] benefits, paid time off, and compensation for continuing medical education; IPMA contracted with an outside CPA firm to administer these services. *See* Doc. 41, ¶¶ 12–16, 43, 64, 66, 67, 71, 112, 114, 152–54 158, 159, 161. And Baxter HR did not administer leave requests, unemployment claims, or workers' compensation claims for IPMA providers, as it did its own employees. *Id.* at ¶¶ 18, 116, 118. While Baxter maintained a "Practitioner's Quality Profile" for all medical providers affiliated with the hospital,[5] *id.* at ¶ 117; Doc. 40-13, pp. 4–6, Baxter HR did not keep *personnel* files on any IPMA providers, as it did on Baxter employees, (Doc. 41, ¶¶ 17, 117). Consistent with the separation of other HR functions, IPMA's CPA maintained certain employee files for the IPMA mid-level providers, like Potter. *Id.* at ¶ 65.

Baxter HR was tasked with investigating discrimination, harassment, and retaliation complaints made by Baxter employees. *Id.* at ¶ 19. Baxter would discipline its employees for violating Baxter's handbook, which covered discrimination, harassment,

---

[4] Though Potter received a recruitment loan from Baxter, for which she filled out a 1099-MISC and W-9, (Doc. 41, ¶¶ 165, 167), and though Baxter's clinic director was, at times, asked to help run the calculations for IPMA providers' bonuses—as discussed later in this Order—there is no evidence that Baxter and IPMA's payroll and tax functions for their employees overlapped.

[5] Plaintiff also asserts that Baxter maintained recruitment files for those providers it had recruited, like Potter. *See* Doc. 41, ¶¶ 17, 65, 117. However, the deposition page cited in support does not appear to be in the record. *See* Docs. 35-3 & 40-22 (excluding page 32 from the Edwards deposition).

and retaliation. *Id.* at ¶ 20. If a Baxter employee made a complaint against a non-employee, Baxter HR would still investigate the matter, *id.* at ¶¶ 21, 119, however, the HR department did not have authority to discipline or terminate a non-employee, such as an outside doctor, *id.* at ¶¶ 22, 120. Instead, HR would refer the complaint to the agency that supervised the non-employee, (Doc. 35-7, pp. 13–14), to Baxter's General Counsel, (Doc. 41, ¶ 197), and/or to the Medical Executive Committee, a committee created under the provisions of the Medical Staff Bylaws, *id.* at ¶ 198. The Medical Executive Committee could recommend certain disciplinary actions, up to and including revocation of privileges. *Id.* at ¶¶ 20, 200.

Potter testified that Baxter required her to have certain certifications and would provide educational training through its Employee Education Department and reminders from credentialing staff when the certifications were set to expire. (Doc. 40-14, ¶ 37). She further stated that Baxter provided guidance on how to complete these trainings. *Id.* According to the unrefuted testimony of Baxter's senior HR manager at the time, Natalie Amato, these educational resources were available to employees, medical providers with privileges, contract staff, and community students. (Doc. 45-2, ¶ 4).

### 2. Baxter Support Staff

IPMA had the right to advise and make recommendations about the "administration and hiring within the Department" and could lodge objections against applicants for Baxter support personnel positions in the clinic. Doc. 41, ¶ 101; Doc. 35-1, pp. 13, 28; *see also* Doc. 35-2, p. 25. If IPMA objected to an applicant or had a complaint regarding an already-employed support staff member, Baxter was required to confer with IPMA to "seek resolution acceptable to both parties." Doc. 35-1, pp. 13–14, 28; Doc. 41, ¶ 99. Still Baxter

"retain[ed] full and complete authority and responsibility with respect to . . . the employment and non-medical supervision of Department personnel." (Doc. 41, ¶ 102; Doc. 35-1, pp. 13–14).

It is undisputed that IPMA would supervise and direct Baxter support staff regarding the provision of medical care to the patients. (Doc. 41, ¶ 98). However, the extent of IPMA's influence over Baxter employees' hiring and discipline is somewhat unclear. *See* Doc. 35-9, pp. 22–23 (Tilley Depo.); Doc. 35-12, pp. 7–8 (Dees Depo.); *see also* Doc. 35-13, p. 17 (Holmes Depo.).

Consistent with the Services Agreements, Tasha Dees, successor to Holmes as clinic director, testified that, if an IPMA provider did not like the Baxter-employed nurse working under them, they could report this to Dees, and she "might try to accommodate that situation" through a "collaborat[ive] effort" if it "was within reason." Doc. 35-12, p. 5; *see also* Doc. 35-13, p. 10 (Holmes Depo.). For example, Potter testified that when she recommended to Holmes that her medical assistant needed additional training, Holmes followed that recommendation. (Doc. 40-14, ¶ 22). Holmes testified that IPMA physicians were able to tell the Baxter nurses what to do, and the nurses "carr[ied] out the doctor's orders." (Doc. 35-13, p. 9). She also testified that she could counsel a Baxter employee at the direction of a provider, though she does not remember doing so. *Id.* at p. 12. She clarified that IPMA providers did not supervise Baxter employees in their day-to-day., *id.* at p. 13, and IPMA providers did not have authority to discipline Baxter employees, *id.* at p. 30, 32.

However, in contrast to Holmes's testimony, Potter maintains that IPMA providers exerted a greater degree of supervisory power over Baxter support staff. For example,

Potter testified that she and other IPMA mid-level providers participated in an applicant's interview for a position as Potter's medical assistant and, at the mid-level providers' recommendation, Holmes hired the medical assistant. (Doc. 40-14, ¶ 23). Potter also testified that, as a physician assistant with IPMA, she had authority to direct Baxter nurses, coders, and schedulers and to verbally discipline Baxter employees. *Id.* at ¶¶ 20–21. Potter explained that if additional disciplinary action was needed, she would take her complaints to the clinic director. *Id.*

### 3.  IPMA Physicians

Baxter specified the medical services to be performed by IPMA's physicians, conducted general supervision, and provided certain rules and regulations that IPMA's physicians were required to follow. (Doc. 35-1, pp. 9, 23). IPMA's physicians, however, made all medical decisions based on their professional judgment. (Doc. 41, ¶ 104; Doc. 35-1, pp. 9, 23). Baxter required that IPMA and its physicians to strictly comply with "currently approved practices of pain management services and in a competent and professional manner so as to meet or exceed all applicable regulatory and licensure standards." (Doc. 35-1, pp. 9, 23). Baxter established rules and regulations pertaining to services in the clinic, the operation of the hospital, and the acceptance and treatment of patients, all of which IPMA was required to follow. *See id.* at pp. 10-11, 24.

Baxter required IPMA to supply a minimum number of physicians to the pain clinic and to provide coverage of the clinic on a full-time basis, meaning, at a minimum, "normal Clinic business hours Monday through Friday for fifty-two (52) weeks of the year, excluding holidays designated by Hospital or other days as agreed upon in writing by Hospital." *Id.* at pp. 10, 24. It also required each IPMA physician to work at least four full

days and one half day per week for at least forty-four weeks in a contract year, excluding Baxter's designated holidays. *Id.* at pp. 9, 23. In the 2020 Services Agreement, IPMA agreed to provide physician coverage for "outlying clinics" per an agreed-upon schedule. *Id.* at p. 24. Baxter also assisted in recruiting physicians to IPMA and, for some, provide a commencement bonus, as it did with Potter. (Doc. 40-22, p. 14).

Baxter's Medical Executive Committee had authority to recommend, among other things, the issuance of warnings, letters of admonition or reprimand, probation, or the suspension of revocation of privileges to physicians. (Doc. 41, ¶¶ 198, 200). Though Dr. Tilley resigned before the Medical Executive Committee took any action regarding the Baxter medical technician's sexual harassment complaint, the complaint was reported to Holmes, referred up to Baxter HR, investigated, and raised to Baxter General Counsel. *Id.* at ¶¶ 190–95, 197.

### 4. *Potter and Mid-Level Providers*

#### i.  Recruitment and Hiring

In 2016, Potter began looking for a physician assistant job in the Mountain Home area. *Id.* at ¶ 122. As part of this search, Potter applied for a position listed on Baxter's career website. *Id.* at ¶ 123. Sarah Edwards, Baxter's physician recruiter at the time, asked Potter to send her CV so Edwards could pass it on to a physician group that was interested. *Id.* at ¶ 124; Doc. 35-4, ¶ 5. Edwards reached out again to Potter in July 2017 to let her know that the group was now ready to bring on a PA. (Doc. 41, ¶ 125; Doc. 35-4, ¶ 6; Doc. 35-5, p. 4). The two discussed some details about the position, and Potter sent her updated CV. (Doc. 41, ¶ 127; Doc. 35-4, ¶ 7; Doc. 35-4, pp. 5–8). According to

Potter's deposition testimony, Holmes and Edwards reviewed her CV, and Potter spoke with Holmes prior to Edwards forwarding her CV to IPMA. (Doc. 40-24, p. 8).

In August 2017, Dr. Tilley began communicating directly with Potter through phone calls and e-mail. (Doc. 41, ¶ 129). Potter was invited for a formal interview with Dr. Tilley and Dr. Chatman in Mountain Home, but the parties dispute whether this invitation was extended by IPMA or by Edwards. *Id.* at ¶ 130; *see also* Doc. 35-4, p. 8 (emails); Doc. 35-9, p. 28 (Tilley Depo.); Doc. 40-14, ¶ 6 (Potter Decl.). Potter traveled to Mountain Home for the interview in October 2017; Baxter paid for Potter's travel expenses. (Doc. 41, ¶¶ 131–33). During her visit, she toured the clinic, had dinner with the IPMA providers, and looked at a potential rental with Edwards. *Id.* at ¶¶ 131, 134; Doc. 40-24, pp. 10–11.

Prior to accepting IPMA's job offer, Potter discussed the day-to-day operations of the clinic with Dr. Tilley and the clinic's mid-level providers. (Doc. 41, ¶ 135). Potter also inquired about benefits, relocation stipends, and signing bonuses with Edwards. *Id.* at ¶ 136. In her response, Edwards clarified that the position with IPMA was "not a hospital employed position" and that Potter "would be employed by the group so they will have to give [her] all the benefits info." *Id.* at ¶ 137.

Edwards informed Potter that Baxter would be willing to give a recruitment loan/commencement bonus once she and Dr. Tilley "came to terms" regarding her employment with IPMA. *Id.* at ¶ 138; Doc. 35-4, ¶ 10; Doc. 35-4, p. 9. Edwards explained in emails to Potter that the commencement bonus is typically provided to Baxter employees, but that Baxter was willing to extend it to Potter to recruit her to the Mountain Home community. (Doc. 35-4, p. 9). Dr. Tilley drafted and emailed Potter an Employment Agreement. (Doc. 41, ¶ 145; Doc. 35-5, pp. 19–20; Doc. 35-9, p. 31). Before Potter signed

the agreement, she and Dr. Tilley communicated via email negotiating terms of her employment including her salary and schedule. (Doc. 41, ¶¶ 142–44, 147; Doc. 35-5, pp. 12–13, 20, 54; Doc. 35-8, ¶ 16; Doc. 35-8, pp. 37–53).

Dr. Tilley and Dr. Chatman—both of whom served as managing members for IPMA—negotiated with and hired mid-level providers to work as employees of IPMA, as reflected by Potter's hiring, and any decision on whether to ultimately interview or hire a mid-level provider (whether recruited by Baxter or not) was IPMA's decision to make. Doc. 41, ¶¶ 56, 57, 128; *see also* Doc. 35-8, ¶ 9; Doc. 35-10, ¶ 15. Although Baxter was undoubtedly involved in recruiting Potter and connecting her with IPMA, and although the Services Agreements stated that IPMA shall select physicians "subject to Hospital approval and the requirement of Medical Staff Appointment and Clinical Privileges," (Doc. 35-1, pp. 9, 23), there is no evidence that anyone from Baxter was actually ever involved in the ultimate hiring decision of an IPMA provider, let alone in the decision to hire Potter specifically. *See* Doc. 35-4, ¶ 4 (Edwards Decl.); Doc. 35-6, ¶ 21 (Amato Decl.); Doc. 35-8, ¶ 9; Doc. 35-10, ¶ 15 (Chatman Decl.); Doc. 35-12, pp. 16–17 (Dees Depo.); Doc. 35-13, pp. 16–17 (Holmes Depo.)).

After signing her Employment Agreement with IPMA, but before moving to Mountain Home, Potter applied for medical privileges at Baxter and was approved by Baxter's Board of Directors. (Doc. 41, ¶¶ 175, 176).

> ii.   Employment Agreement with IPMA and
> Protocol Agreements with IPMA Physicians

Potter signed the Employment Agreement with IPMA in November 2017, (Doc. 41, ¶ 150); it was also signed by Dr. Tilley and Dr. Chatman. Baxter was not a party to the Employment Agreement. *Id.* at ¶ 151; Doc. 35-5, pp. 64, 78. The Agreement stated that

16

Potter "shall exercise independent medical judgment and control over performed professional activities and services, subject to the supervision and medical judgment of the applicable supervising physician." (Doc. 35-5, p. 67). The Employment Agreement further provided that Potter "shall be subject to and shall abide by all [IPMA] *and* [*Baxter*] policies, rules, regulations and guidelines that are applicable to PA." *Id.* at p. 67 (emphasis added).

The Agreement imposed various requirements on Potter, such as requiring that she maintain licensure, certification, third-party payor credentialing, and medical staff membership, *id.* at p. 65. It also included information regarding her schedule, required hours, compensation, production bonuses, employee benefits, and paid time off. *Id.* at pp. 65, 66, 75, 77–78; Doc. 41, ¶¶ 152, 153. The Agreement required Potter to "cooperate with the administration of [IPMA] *and* [*Baxter*] including, but not limited to, billing, peer review and [IPMA's] compliance programs." (Doc. 35-5, p. 67 (emphasis added)). It also stated that Baxter "shall recruit and employ, at the Practice Location, all medical and non-medical personnel as reasonably determined by The Practice." *Id.* at p. 65.

Potter also entered a Physician Assistant Protocol and Delegation of Services Agreement ("Protocol Agreement")—signed by her and IPMA physicians—that specified the type of work she may perform and the medications she may prescribe. (Doc. 41, ¶ 174; Doc. 35-10, pp. 13–17). It also specified the type and frequency of supervision and the process of evaluation by her supervising physicians. (Doc. 35-10, p. 14). The 2018 and 2019 Protocol Agreements specify IPMA physicians as the supervising and the back-up supervising physicians. *Id.* at pp. 13–17. There is no evidence that Baxter was involved in the Protocol Agreements.

### iii.  Loan Agreement with Baxter

After signing her Employment Agreement, Potter entered into a Loan Agreement with Baxter. (Doc. 41, ¶¶ 162, 164). The loan was negotiated between Potter and Edwards with Edwards noting that Baxter typically provided such bonuses to employees, but they were willing to extend it to her as well to recruit her to the community. (Doc. 35-4, p. 9 (emails)). The Loan Agreement gave Potter a $5,000.00 loan that would be forgiven after two years provided that Potter work "full time work in [Baxter's] Integrative Pain Center in Mountain Home, Arkansas," meaning forty hours per week and forty-eight weeks per year. (Doc. 41, ¶¶ 162, 163, 166; Doc. 35-4, p. 13). While the Loan Agreement required her to obtain medical staff privileges with Baxter, (Doc. 35-4, p. 13), it did not restrict her from obtaining privileges at other hospitals in the community, *id.* at p. 15. It also required that she obtain an unrestricted license to practice medicine in Arkansas at least sixty days before her first day and required that she maintain professional liability insurance *Id.* at p. 14. The Loan Agreement framed Potter as an independent contractor and stated that she would be engaged in private practice and "shall not provide such services on behalf of, or at the direction and control of, [Baxter]." *Id.* at p. 15. Additionally, the Agreement left final treatment decisions up to Potter. *Id.* at p. 13.

### iv.  Supervision and Feedback

IPMA's mid-level providers were required to be supervised by IPMA's licensed physicians, (Doc. 41, ¶ 62), and the IPMA physicians provided day-to-day supervision over the mid-level providers. *Id.* at ¶ 91; Doc. 35-2, p. 37. IPMA, and specifically the managing member, controlled scheduling the mid-level providers. Doc. 41, ¶ 58; *see* Doc. 35-5, p. 66; Doc. 35-10, ¶¶ 15, 26; Doc. 35-12, p. 21. However, once the schedules were

determined by the managing member, Baxter support staff would schedule patient appointments for the providers.[6] (Doc. 41, ¶ 59; Doc. 35-8, ¶¶ 11, 15; Doc. 35-12, p. 22; Doc. 35-13, p. 22–23). Any deviation from an IPMA providers schedule (such as for an afternoon off) was to be approved by Dr. Tilley or Dr. Chatman (although some unapproved "shifting" occurred). (Doc. 41, ¶ 61; Doc. 35-8, ¶ 11; Doc. 35-10, ¶ 26; Doc. 35-13, p. 30). Potter testified that Baxter executives and/or administration would regularly stop by the clinic to check in and/or to ensure that a provider was still there late in the day, though the full purpose of such visits is not clear. *See* Doc. 40-14, ¶ 18; *see also* Doc. 35-16, pp. 11–12 (Vice President of Baxter's business development, describing that he only met Potter a couple times in the Harrison clinic and that he was there to seek provider input on expanding the clinic rooms).

Regarding feedback on work performance, there is no evidence that Potter—or any other mid-level providers—were disciplined by anyone at Baxter or IPMA. Dr. Chatman, however, did verbally counsel Potter on certain matters. (Doc. 41, ¶¶ 188–89). IPMA providers did have some feedback-based interactions with Baxter. For example, patients could complete surveys of IPMA providers; Baxter would capture this data and Holmes, the clinic director, would read the surveys and pass them on to the providers. (Doc. 40-17, p. 25). While at times Holmes would discuss the surveys with the providers, this was usually just to pass on compliments. *Id.* at p. 26. Additionally, Potter received an

---

[6] In her testimony, Potter stated that Holmes would decide how many patients she saw in a day or which location she was scheduled at, only to concede that it was "possible" these were Dr. Chatman's decisions and that she was "sure [Holmes and Dr. Chatman] discussed it." (Doc. 35-5, p. 36). The Court believes it is undisputed that Dr. Chatman *set* the schedule.

award from Baxter because of a patient review about the care she received from Potter. (Doc. 41, ¶ 189; Doc. 40-17, p. 28).

Under the terms of Potter's Employment Agreement with IPMA, she was eligible for certain productivity bonuses depending on the number of patients she saw per week. (Doc. 41, ¶ 149; Doc. 35-10, p. 126). According to Potter, when Dr. Chatman took over as managing member, he changed the bonus structure and her scheduled days off, against the terms of her Employment Agreement. (Doc. 41, ¶¶ 205–07). In response, Potter raised questions regarding bonus calculations, so Dr. Chatman hired the clinic director on an independent contractor basis to calculate mid-level provider bonuses as a "neutral party." *Id.* at ¶ 69; Doc. 35-11, pp. 12, 15–16. The clinic director would calculate the bonuses according to an equation provided by Dr. Chatman along with the monthly patient volume numbers supplied to Baxter by IPMA on a daily basis. (Doc. 41, ¶ 70). The clinic director received a check issued by IPMA's third-party accountants for this service. (Doc. 35-11, pp. 15–16; Doc. 35-13, p. 34). Other than the recruitment loan given to Potter by Baxter, all payroll and bonus checks were issued to Potter by IPMA. (Doc. 41, ¶ 160).

v.  Termination

Other than potential revocation of privileges, which could result in an IPMA provider being terminated, Baxter did not have *contractual* authority to terminate IPMA providers' employment. *See* Doc. 41, ¶ 121; *see* Doc. 35-1, pp. 7–33 (Services Agreements).

In 2022 Dr. Chatman asked Potter to resign, citing Potter's involvement in reporting the allegations against Dr. Tilley. *See* Doc. 41, ¶ 208. Potter refused to resign. *Id.* at ¶ 212. Thereafter, Dr. Chatman terminated Potter's employment with IPMA. *Id.* at ¶ 217. The termination letter was signed "Ira Chatman, MD Interventional Pain Management

20

Associates, PLLC," and had a banner along the bottom stating, "A Department of Baxter Regional Medical Center." *Id.* at ¶ 218; Doc. 40-5.

Potter recorded the conversation in which Dr. Chatman asked her to resign. However, in his deposition testimony, Dr. Chatman withdrew the statements he made in this conversation, claiming that most of what he said were fabrications to influence Potter to resign. Additional details on the recorded conversation and Dr. Chatman's recanting follow.

*Recording of the Resignation Request*

In Potter's meeting with Dr. Chatman, Dr. Chatman told Potter that she had been "painted with the brush of being a rabble rouser" due to her involvement in reporting the sexual harassment allegations against Dr. Tilley and advised that she "relocate very distantly," either outside of Arkansas or outside the pain management field. (Doc. 40-25, at 7:34–7:53, 13:30). Dr. Chatman told Potter that her employment at IPMA could not continue because Baxter wanted to make it possible for Dr. Tilley to return to his position. (Doc. 41, ¶ 209).

When Potter stated that she had not heard anything from Baxter regarding this decision and asked if she should expect to, Dr. Chatman responded that if she did not resign, Baxter's Board of Directors would get involved, and she would get reported to a national registry that catalogues personnel related problems and that this "black stripe" against her would show up on future background checks by potential employers. (Doc. 40-25, at 9:45–10:35). Potter sought clarification, asking if the push to bring Dr. Tilley back or remove her was coming from Peterson, Baxter's CEO. *Id.* at 16:30. Dr. Chatman responded that "this is probably more board level," *id.* at 16:35, but that, at this point, it

was still his decision. *Id.* at 17:15. He again warned that if he did not take action, the board would get involved which would lead to Potter being reported to the national registry. *Id.* at 17:37. Dr. Chatman contextualized these statements by saying that Baxter is very "vindictive." *Id.* at 16:30.

Dr. Chatman explained that he recently met with Baxter executives, including Peterson and Larry, where the "underlying message" was that Baxter wanted Dr. Tilley to return to his position and that Dr. Chatman needed to do whatever was necessary to make that happen, which apparently included terminating Potter. *Id.* at 10:45.[7] Dr. Chatman suggested to Potter that, should she refuse to resign, Dr. Tilley could make calls that would make her unemployable throughout the State of Arkansas. *Id.* at 11:55. Though he admitted that Dr. Tilley had not communicated this intent to him, he "knew" what Dr. Tilley was like. *Id.* at 22:10. Dr. Chatman added that, if he, himself, felt like he had been "stuck in the back," he would "return the favor." *Id.* at 22:18. Dr. Chatman ended by saying that, although he finds the situation troublesome, it is something that "needs to happen, it will happen," and the only question is "how quietly it happens." *Id.* at 21:40.

### Dr. Chatman's Retraction and Other Record Evidence

Despite all that was said in the recorded meeting, Dr. Chatman testified that he made the decision to terminate Potter and that Baxter was not involved in the decision and never expressed any opinion on the decision. (Doc. 35-10, ¶¶ 16, 17; Doc. 41, ¶ 211). Dr. Chatman stated in his deposition that he "implied to [Potter] certain things that [were]

---

[7] Per Dr. Chatman's testimony, Dr. Chatman had in fact met with Peterson and Larry shortly before this conversation with Potter. In his recanting, Dr. Chatman explained that the meeting with Peterson and Larry was actually to discuss repair conditions of the clinic building. (Doc. 35-11, p. 52).

not true," including that she could not continue her employment because the hospital wanted to make it possible for Dr. Tilley to come back. (Doc. 35-11, pp. 35–36). In Dr. Chatman's own words, he invented "total fabrications" and said "absolutely anything [he] could with the hopes that [ ] Potter would just go away," including his statement that Baxter was "pushing strongly for the concept that Dr. Tilley would have the option of coming back." *Id.* at, pp. 44–45. Put differently, Dr. Chatman claims that he made these statements "to exert pressure on [ ] Potter to do what [he] wanted her to do," but that these statements—particularly about the board being involved—were not truthful. *Id.* at p. 57; Doc. 41, ¶ 210. Dr. Chatman stated that Peterson was not even aware of his intent to terminate Potter, and he, Dr. Chatman, "create[ed] out of thin air any story [he] could get to hopefully get [Potter] to simply resign." (Doc. 35-11, pp. 53–54).

There is some record evidence to support Dr. Chatman's retractions. Peterson testified that he never discussed or recommended terminating Potter, nor did he discuss bringing back Dr. Tilley.  (Doc. 35-2, p. 35).  More generally, Peterson testified that Baxter does not make any decisions regarding termination of IPMA employees. Doc. 35-1, ¶ 11; Doc. 35-2, p. 35; *see also* Doc. 35-12, pp. 29–30 (Dees Depo.). Additionally, Dr. Tilley testified that, while he was at IPMA, the decision to hire, counsel, or terminate IPMA mid-level providers was solely that of IPMA. (Doc. 35-8, ¶ 9).

### D.  Common Ownership or Financial Control over Entities

No current or former member or owner of IPMA has served on Baxter's Board of Directors since 2013 or has been an officer of Baxter. (Doc. 41, ¶¶ 7, 8). There is also no evidence that either company owns any shares of the other or that the entities share any

common officers. Further, there is no evidence that either entity exerted financial control over the other.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

Once the moving party has met its burden, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, for there to be a genuine issue of material fact that would preclude summary judgment, the nonmoving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248).

## III.    DISCUSSION

The Court first addresses the parties' arguments regarding the admissibility of Dr. Chatman's recorded statements. It then turns to whether IPMA and Baxter may be viewed as a single employer under the four *Baker* considerations. Lastly, the Court addresses IPMA's argument on aggregation of employees.

### A.    Whether the Court May Consider the Recorded Statements

First, the Court must address the foundational issue of whether Dr. Chatman's recorded statements may be used to create a genuine issue of fact as to Baxter's involvement in Potter's termination or whether they constitute inadmissible hearsay insufficient to create such an issue of fact. *See Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010) (noting "inadmissible hearsay evidence cannot be used to defeat summary judgment").[8]

Plaintiff argues that the statements are opposing party statements and therefore definitional non-hearsay under Federal Rule of Evidence 801(d)(2).[9] As it relates to IPMA, the Court agrees with Plaintiff because the statements were made by Dr. Chatman, an agent of IPMA, within the scope of that relationship while it existed. Fed. R. Evid.

---

[8] See also *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1311–12 (8th Cir. 1993), which explains that hearsay testimony can be used as impeachment evidence at summary judgment which may be sufficient to defeat summary judgment where the later statement of the declarant is the only evidence on that issue of fact and the movant bears the burden of proof. However, where, as here, there is additional evidence on that issue of fact that has not been brought into doubt by any impeachment evidence, the prior inconsistent statement will fail to defeat summary judgment. *Id.*

[9] The Court notes that, regardless of whether the recorded statements are hearsay when offered for the truth of whether Baxter was involved in the decision to terminate Potter, the recorded statements would be admissible to prove what was in fact said by Dr. Chatman to Potter in that meeting.

801(d)(2)(D). Therefore, Dr. Chatman's recorded statements as used against IPMA are not hearsay; they are admissible and may be used by the Court at summary judgment.

Less certain is whether the recorded statements are hearsay as used against Baxter; or, more specifically, whether Dr. Chatman acted as Baxter's agent when he made these statements. To determine the existence or scope of an agency relationship under Rule 801(d)(2)(D), the "[s]tatement must be considered but does not by itself establish" the agency relationship. Here the statements at issue include Dr. Chatman's assertions that Baxter wanted Dr. Tilley to return and had asked him to do whatever was necessary to make that happen and his remarks about potential consequences with Baxter if Potter refused to resign.

A person may act as an agent of another when he acts with apparent authority. "Apparent authority results from a manifestation by a principal to a third party that reasonably leads a third party to believe that another person is acting as the principal's agent." *Millard Processing Servs., Inc. v. N.L.R.B.*, 2 F.3d 258, 262 (8th Cir. 1993) (citing *NLRB v. Donkin's Inn, Inc.,* 532 F.2d 138, 141 (9th Cir. 1976)). A principal can create apparent authority where it "should realize that its conduct is likely to create such a belief." *Id.* (citing *Restatement (Second) of Agency* § 27, cmt. A (1958)). "Only information actually communicated to and known by a third party can establish apparent authority." *Id.* (citing *Restatement (Second) of Agency* § 27, cmt. b)). Baxter argues that Dr. Chatman was not an agent pursuant to the Services Agreements between IPMA and Baxter. However, whether apparent authority exists is based upon the third party's—here, Potter's—reasonable belief. The inter-dependent relationship between Baxter and IPMA creates a genuine issue of fact as to whether Potter reasonably believed Dr. Chatman was acting

at Baxter's behest and whether Baxter should have realized that its conduct would lead Potter to have such a belief.[10] As Holmes stated, the relationship between IPMA and Baxter was "even confusing to people that worked at the hospital because it was so unusual," such that "everyday employees" "didn't understand the uniqueness of the situation." (Doc. 40-17, p. 32). Thus, while the Court cannot make a final determination as to the recorded statements' admissibility as used against Baxter on this record, it finds that they are likely admissible as definitional non-hearsay.

### B.    Single Employer: Applying the *Baker* Considerations

Title VII of the Civil Rights Act of 1964 defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C. § 2000e(b). The statute "is to be accorded a liberal construction in order to carry out the purposes of Congress to eliminate the inconvenience, unfairness and humiliation" that result from violation of the statute. *Baker*, 560 F.2d at 391 (citations omitted). "Such liberal construction is also to be given to the definition of "'employer.'" *Id*. (citations omitted). In light of this liberal construction, courts permit the consolidation of separate entities to meet § 2000e(b)'s threshold numerosity requirement. *Baker*, 560 F.2d at 391–92. However, the Eighth Circuit has warned that "[i]n situations where the court is asked to disregard the separate and distinct form of legal entities, the standards are

---

[10] The Court looks to Baxter and IPMA's relationship both as a whole and at specific interrelations, including, *inter alia*: the joint effort to recruit Potter; Dr. Chatman's collaboration with a Baxter employee to calculate Potter's bonus; IPMA's provision of medical staff for Baxter's clinic; Baxter's setting of the clinic's hours; Baxter's requirement that all IPMA providers maintain medical staffing privileges with Baxter; and Baxter's investigation of the complaints against Dr. Tilley, including Baxter HR's interview of Potter.

narrow and rigorous, imposing a presumption of corporate separateness." *Davis*, 765 F.3d at 827 (citations omitted).

Here, it is undisputed that at no time did IPMA employ fifteen or more employees. So, the survival of Plaintiff's claim rests on the Court finding that IPMA and Baxter can be consolidated as a single employer. An integrated enterprise is "one in which the operations of two or more employers are considered so intertwined that they can be considered the single employer of the charging party." *Davis*, 765 F.3d at 827 (quoting EEOC Compliance Manual § 2-III(B)(1)(a)(iii)(a)).

The Eighth Circuit has adopted the following four considerations when determining whether two entities constitute a single employer: (1) the degree of interrelation between the operations; (2) the degree to which the entities share common management; (3) the centralized control of labor relations; and (4) the degree of common ownership or financial control over the entities. *Baker*, 560 F.2d at 392; *Davis*, 765 F.3d at 827. "No one of these factors is controlling nor need all criteria be present; single employer status is a factual question that ultimately depends upon all the circumstances of the individual case." *Iowa Express Distrib., Inc. v. NLRB*, 739 F.2d 1305, 1310 (8th Cir. 1984) (citations omitted). However, the Eighth Circuit has noted that the first three factors hold the most weight, *see Pulitzer Publishing Co. v. NLRB*, 618 F.2d 1275, 1279 (8th Cir. 1980), with several courts noting the third factor, centralized control over the labor relations, as the most important, *see, e.g.*, *Backus v. Mena Newspapers, Inc.*, 224 F. Supp. 2d 1228, 1232–33 (W.D. Ark. 2002); *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 927 (5th Cir. 2021); *see also* EEOC Compliance Manual § 2-III(B)(1)(a)(iii)(a). The Eighth Circuit has noted that although contractual provisions stating that two entities are not meant to be a

28

single employer "can be indicative of the parties' basic intentions and their understanding of the contractual arrangement," such language is "not necessarily controlling." *Pulitzer Pub. Co. v. N.L.R.B.*, 618 F.2d 1275, 1279 (8th Cir. 1980).

Briefly, the Court wishes to address *Perry v. VHS San Antonio Partners, L.L.C.*, a recent Fifth Circuit case at the center of the parties' briefing. 990 F.3d 918. In *Perry*, the Fifth Circuit affirmed the lower court's grant of summary judgment on the threshold question of whether a physician group and a hospital were a single integrated enterprise. There, the physician group was the "'exclusive provider' of pediatric critical care services" for the hospital's pediatric intensive care unit. *Id.* at 922. The plaintiff—a pediatric ICU physician—brought a claim for race discrimination under Title VII after the physician group terminated him at the hospital's request. *Id.* at 924.

At first blush, the Fifth Circuit applied the same four factors used by the Eighth Circuit. But the Fifth Circuit has defined those factors much more narrowly than the Eighth Circuit.[11] The Court declines to follow *Perry* and narrow the *Baker* factors in contravention of Eighth Circuit precedent. The Fifth Circuit's decision in *Perry* is not binding on the Court. And, given the Fifth Circuit's minimal engagement with the facts in its analysis and the distinction between the Fifth and Eighth Circuit's tests, the Court does not find it persuasive.

---

[11] For example, the Fifth Circuit cabins interrelation of operations as "whether one entity excessively influenced or interfered with the business operation of the other," noting that "[e]vidence that one entity is involved in the daily employment decisions of the other is central." *Perry*, 990 F.3d at 927. The Eighth Circuit, however, has clearly stated that "[t]he interrelation of operations factor examines whether the two entities share managers and personnel, payroll, insurance programs, office space, and equipment[;] . . . . whether the entities are operated as a single unit, and whether the entities' functions and purpose are similar or distinct." *Davis*, 765 F.3d at 827 (citing *Sandoval v. Am. Bldg. Maintenance Indus., Inc.*, 578 F.3d 787, 793 (8th Cir. 2009)).

### 1.  Degree of Interrelation of Operations

"The interrelation of operations factor examines whether the two entities share managers and personnel, payroll, insurance programs, office space, and equipment[;] . . . . whether the entities are operated as a single unit, and whether the entities' functions and purpose are similar or distinct." *Davis*, 765 F.3d at 827 (citing *Sandoval v. Am. Bldg. Maintenance Indus., Inc.*, 578 F.3d 787, 793 (8th Cir. 2009)).

In *Davis*, the Eighth Circuit found that the two entities did not have sufficiently interrelated operations to be considered a single entity. In so finding, the court noted the following: each entity had a separate function and purpose, evidenced in part by the fact that the two entities "occup[ied] different office space in two different states"; there was no evidence that the two entities shared the same personnel or managers; and each entity was responsible for its own day-to-day business decisions, including purchasing its own supplies. 765 F.3d at 827–28 (citations omitted). Though the court found there was some overlap in the provision of administrative services, that did not create a sufficient degree of interrelatedness in light of the totality of the relationship. *Id.* at 828.

The case at bar is distinct from *Davis* because Baxter and IPMA operated as a single entity with a high degree of interrelation of operations. To start, the creation and running of IPMA shows that IPMA and Baxter's pain management clinic had similar—if not identical—functions and purposes, unlike in *Davis*. Prior to starting IPMA, Dr. Tilley approached Baxter about opening an interventional pain management practice to serve the residents of Mountain Home. At that time, Baxter had a limited pain management department that it was considering closing. So, Dr. Tilley and Dr. Chatman formed IPMA to provide physicians to Baxter's pain management clinic through the Services

Agreements. IPMA provided all doctors and mid-level providers for Baxter's pain management clinic—including the primary location in Mountain Home and other satellite locations, like Harrison—and Baxter required the IPMA providers to work in the clinic full time. Baxter provided all support staff, including the nurses and medical technicians that worked directly with and under IPMA providers in providing medical care to patients and a clinic director that managed the operations of the clinic. Baxter dictated when these support staff would be available to IPMA providers. Neither Baxter nor IPMA could run the pain clinic without the other. *See* Doc. 40-18, p. 32 (Chatman testifying that the pain clinic could not operate without IPMA physicians and IPMA physicians could not provide services in the clinic without Baxter's support staff).

Here, there is evidence that IPMA and Baxter shared personnel, facilities/office space in a jointly owned building, and equipment. Indeed, IPMA and Baxter "shared a clinic space to jointly operate the clinic for the purpose of providing" pain management services. *Bowen v. Methodist Fremont Health*, 2020 WL 1904832, at *7 (D. Neb. Apr. 16, 2020) (finding this factor weighed in favor of consolidation under *Baker* factors). In fact, under the terms of the Services Agreements, Baxter had final say over what equipment was "necessary and appropriate" for IPMA, and Baxter's consent was required for IPMA to supplement its equipment, unlike the relationship in *Davis* where the two entities had no say in one another's day-to-day business decisions and purchased their own supplies. IPMA and Baxter's integration is further demonstrated by evidence that Baxter paid the monthly fees for IPMA's record-keeping software, and under the terms of the Services Agreements, IPMA's accounts and records of professional work and patient histories were "the exclusive property" of Baxter.

31

The Court also notes the additional interrelation of IPMA and Baxter's operations. Under the Services Agreements, Baxter established the fees for services provided by the clinic. As for insurance, Plaintiff has presented evidence that Baxter employees assisted Potter in obtaining her insurance credentials and updated IPMA's licensing with Medicaid and the Council for Affordable Quality Healthcare. *See Baker*, 560 F.2d at 392 (taking into consideration services such as "check writing and completion of the necessary forms for broadcast license renewals" in finding two companies had sufficiently interrelated operations). Per the terms of the Services Agreements, IPMA's professional liability insurance policy was required to include a clause that it could not be cancelled without thirty-days' notice to Baxter and that Baxter must be given an opportunity to pay the premium and maintain the insurance on IPMA's behalf. IPMA also used Baxter's letterhead, and Baxter's website provided the clinic's hours, address, and contact and biographical information for IPMA's providers. Additionally, Baxter-employed coders assisted with IPMA's tickets, and a Baxter-employed clinic director would personally hand deliver IPMA's tickets to IPMA's third-party billing company and pick them up when the billing company was finished.

Plaintiff has presented evidence to create genuine issues of material fact as to whether the interrelation of operations was sufficient to support a finding that IPMA and Baxter were a single employer.

### 2.  Degree to Which the Entities Share Common Management

"The degree to which the entities share common management includes whether the same individuals manage or supervise the different entities or whether the entities

have common officers and boards of directors." *Davis*, 765 F.3d at 828 (quoting *Sandoval*, 578 F.3d at 793).

Again, the Court looks to *Davis*, in which the Eighth Circuit found that there was no overlap of managerial and supervisory responsibilities, even if there was some overlap in personnel. *Davis*, 765 F.3d at 828; *Perry*, 990 F.3d at 928. Here, there is some degree of overlap in the direction and oversight of the facilities. *See Davis*, 765 F.3d at 825–26 (finding no common management where neither entity directed or oversaw the corporate decisionmaking *or facilities* of the other). The clinic was managed by both an IPMA physician (i.e., Dr. Chatman or Dr. Tilley) and a Baxter employee (i.e., the clinic director). Baxter was in charge of determining the necessary equipment and support personnel for the clinic and IPMA providers. Baxter controlled when the clinic facilities would be open. And there is evidence that IPMA providers had supervisory power over Baxter employees in the clinic. Further, the building itself was jointly owned by Dr. Tilley, Dr. Chatman, and Baxter, and decisions about the building were jointly made as evidenced by Dr. Chatman's meeting with Peterson and Larry regarding building repairs. Thus, while this factor does not weigh strongly in favor of consolidating IPMA and Baxter, there is some evidence to distinguish it from *Davis* and to support Plaintiff's position.

### 3. *Centralized Control of Labor Relations*

Whether the entities have centralized control of labor relations looks to who sets employment policies, work schedules and salaries; who is responsible for hiring, firing, and disciplining its employees; who issues payment; and who controls the job functions and responsibilities of its employees. *Davis*, 765 F.3d at 828; *see also Sandoval*, 578 F.3d at 793 (noting the EEOC Compliance Manual's consideration of "the extent to which there

is a centralized source of authority for development of personnel policy, maintenance of personal records, human resources, and employment decisions"). In short, this consideration looks at whether one entity exercises "significant control" and "oversight" over the other. *Davis*, 765 F.3d at 828.

The parties cite to cases that have boiled this factor down to a single question: Who makes the final personnel decisions regarding the plaintiff? *See, e.g.*, *Perry*, 990 F.3d at 927 ("We have refined the inquiry into one question: What entity made the final decisions on employment matters regarding the person claiming discrimination?" (citations omitted)); *see also Backus v. Mena Newspapers, Inc.*, 224 F. Supp. 2d 1228, 1232–33 (W.D. Ark. 2002) ("[O]ther courts have applied [the *Baker*] factors and have held that the critical question to be answered is: 'What entity made the final decision regarding employment matters related to the person claiming discrimination?'" (citing *Vance v. Union Planters Corp.*, 279 F.3d 295, 297 (5th Cir. 2002)). This may be the "critical question," but under Eighth Circuit caselaw, it is not the only question. Thus, consistent with the Eighth Circuit's opinion in *Davis*, the Court will take this question into account, but will not view it as determinative on this factor.

The record evidence tends to show that IPMA and Baxter set their own policies for their employees. However, there is evidence that IPMA providers were held to certain Baxter policies beyond the Medical Staff Bylaws—namely Baxter's anti-discrimination and anti-harassment policies. Notably, under the Services Agreements, Baxter promulgated rules regarding the operation of the clinic and acceptance of patients—all of which IPMA and its physicians were required to follow. *See Baker*, 560 F.2d at 389 (finding that the companies were sufficiently interrelated, in part, because one company issued

34

policy manuals that the other was required to follow). Additionally, under the Services Agreements, IPMA was required to respond to patient complaints by submitting a written plan of action to Baxter's administration. As to Baxter's support staff, there is evidence that IPMA providers supervised Baxter employees, such as directing the nurses, medical technicians, and coders, and even verbally disciplining them.

Under the terms of the Services Agreements, Baxter not only set hours for the IPMA clinic, but specifically required each IPMA physician to work a certain number of hours and days for a certain number of weeks each year. There is also testimony from Potter—albeit disputed—that Baxter executives would stop into the pain management clinic to ensure that a provider was still there later in the day.

Regarding personnel decisions, under the Services Agreements, Baxter had veto power over IPMA's selection of physicians, and IPMA had the right to advise and make recommendations about the hiring of Baxter support staff within the clinic. In fact, there is evidence that Potter had participated in interviews with Baxter support staff and made hiring and training recommendations that Baxter followed. There is also evidence— though disputed—that IPMA providers had authority to recommend termination of Baxter employees whose performance was unsatisfactory. As to Potter's hiring and termination, there is evidence that Baxter played some role in her selection by soliciting and vetting her application prior to passing it on to IPMA. And it is disputed whether the invitation to Potter to interview came from IPMA or Baxter's employee, Sarah Edwards. Also of note are the undisputed facts that Baxter covered Potter's expenses when she travelled to Mountain Home to interview and that Baxter provided a recruitment bonus/loan that was typically reserved for Baxter employees in return for Potter agreeing to work in Baxter's

pain management clinic for a set number of years. There is also some evidence—viewed in the light most favorable to Plaintiff—that suggests that Baxter executives may have influenced Potter's termination by Dr. Chatman. Reasonable inference from the audio recording also supports that the threat of *Baxter's* ultimate ability to revoke Potter's privileges (thereby resulting in Potter's termination from IPMA) and put a black stripe on her record was a catalyst in Dr. Chatman's decision to fire her.[12]

Admittedly, there were several aspects of the control of labor relations that were separate. However, when viewing all evidence and making all inferences in Plaintiff's favor, the Court finds that Plaintiff has created a genuine issue of material fact as to whether control of labor relations was sufficiently centralized to weigh in favor of consolidating Baxter and IPMA. *See Jarred v. Walters Indus. Electronics, Inc.*, 153 F. Supp. 2d 1095, 1100 (W.D. Mo. 2001) (consolidating two entities even where there was a "less than complete, though still significant, degree of centralized control of labor relations"). That is, Plaintiff has shown sufficient centralization of labor relations as a matter of reasonable inference.

### 4. Degree of Common Ownership or Financial Control

"The degree of common ownership or financial control asks whether one company owns the majority or all shares of the other and if the entities share common officers or directors." *Davis*, 765 F.3d at 828–29 (quoting *Sandoval*, 578 F.3d at 793). There is no

---

[12] Defendants argue that, if the Court credits the recording of Dr. Chatman's statements, it should still find that there is no genuine issue of material fact that Baxter was involved in the final decision to terminate Potter due to the specific language used by Dr. Chatman (e.g., that his insistence Potter resign was due only "in part" to Baxter wanting to bring back Dr. Tilley). The Court believes the jury should decide how much weight to give Dr. Chatman's hedging.

overlap in the ownership of IPMA and Baxter. Further, based on the undisputed evidence, neither entity exerts any meaningful control over the other entities finances. Thus, this consideration weighs against consolidation of IPMA and Baxter.

* * *

Here, the Court finds that Plaintiff has created a genuine issue of material fact on the first and third factors, with some evidence weighing in Plaintiff's favor on the second factor as well. Admittedly, whether IPMA and Baxter are a single employer is a close call. However, given that the Court must view all facts and make all reasonable inferences in the nonmovant's favor at this stage, the Court finds that—looking at the balance of the *Baker* considerations—there is a genuine issue of material fact as to whether IPMA and Baxter should be treated as a single employer.[13]

## IV.    CONCLUSION

For the reasons stated herein, the Court finds that there is a genuine issue of material fact on whether IPMA and Baxter may be held liable as a single employer under Title VII. Accordingly, Defendants' Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED** on this 29th day of January, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

[13] Because the Court finds there is a genuine issue of material fact as to whether the two entities were a single employer under *Baker*'s four-factor test, it declines to resolve IPMA's concern regarding aggregation of employees in a joint employer situation, which it raised for the first time in its Reply. *See* Doc. 46, p. 1 (citing EEOC Compliance Manual § 2-III(B)(1)(a)(iii)(b).